UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS KEANE STETLER,

        Petitioner,         Case No. 1:17-cv-230

v.        Honorable Paul L. Maloney

SHANNON WAGNER,

        Respondent.
_____/

## OPINION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, RULES GOVERNING § 2254 CASES; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir. 1999). After undertaking the review required by Rule 4, the Court concludes that the petition must be dismissed because it fails to raise a meritorious federal claim.

## Factual Allegations

Petitioner was convicted by a jury in the Kalkaska County Circuit Court of two counts of second-degree criminal sexual conduct (CSC III), MICH. COMP. LAWS § 750.520c(1)(f). The Michigan Court of Appeals provided the following summary of the evidence presented at trial:

> Stetler was a licensed physician's assistant and registered nurse. Although supervised by a medical doctor, Stetler essentially operated his own general practice out of the Boardman Health Clinic in Kalkaska County. The medical doctor who supervised Stetler testified that his supervisory role was limited to assuring the quality of Stetler's work by reviewing a sample of Stetler's charts on a monthly basis.
>
> At some time before the events at issue, Stetler researched hypnosis. Stetler testified that he learned hypnosis from texts and through research available on the internet. He then began to use hypnosis to treat patients in his practice. He did not, however, inform his supervisor that he was using it in his practice.
>
> In August 2010, TB began to see Stetler. She consulted with him about whether she might be a good candidate for weight-loss surgery. TB testified that Stetler did not believe that she was a good candidate for surgery; instead, he suggested hypnosis. Stetler used hypnosis to treat TB for weight loss and she felt that the sessions helped. For that reason, she asked Stetler to use hypnosis to help her quit smoking. In all, she had four hypnosis sessions with Stetler from August to October 2010.
>
> TB returned to see Stetler for another hypnosis session to help her quit smoking in 2011. She stated that she went to Stetler's clinic at about 6 pm on August 25, 2011. When she arrived, Stetler was with another patient, but there was no staff or other persons in the clinic. She testified that, after Stetler finished with the other patient, he suggested that they move to his office for her hypnosis therapy.
>
> TB agreed to have the session in Stetler's office. She lay down on the couch in the office and he proceeded to hypnotize her using language similar to that from her previous sessions. However, he soon began to make odd references—he told her to imagine a "pleasurable spot" and to imagine that he was rubbing her shoulders. Stetler also told her to imagine that he was rubbing her "all over now in that area that, you know, brings a woman pleasure." He also told her to imagine "a big, strong man like me thrusting in and out, in and out to bring you pleasure." He told her that the pleasure was building and getting more powerful and that she was going to "come", which she understood to mean that he wanted her "to orgasm." He then told her that it was ok to touch herself and

told her to do so. She stated that she began to rub herself and he suggested that she should expose her breasts. She complied and he pulled her shirt down further and began to pinch her nipple. Eventually, she put her shirt back in place and put her arms across her chest. After he realized that she was not responding to his sexual suggestions any more, she said he "went back into talking about . . . smoking" and then brought her out of hypnosis.

TB testified that, after Stetler pulled her out of hypnosis, she tried to "play it cool" because she knew that she was alone with him and "he's a big guy." She tried to "keep it together" after she left the clinic, but she had to pull over because she was "hysterical." She called a friend who advised her to call the police. She then called 911 and an officer met her in a nearby parking lot.

An officer testified that he met TB and convinced her to come back to the post to give a statement. He interviewed Stetler later that same evening and Stetler admitted that he was using hypnosis in his practice, but denied TB's accusations: "He . . . told me several times that he was in shock, that he didn't know how to respond, and that, you know, he didn't do what he was being accused of." The officer stated that he obtained a search warrant for Stetler's clinic and seized books, documents and computer materials from Stetler's office. Although some of the books and documents concerned hypnosis generally, other media involved the use of hypnosis for sexual or erotic purposes.

On August 31, 2011, another of Stetler's patients, TL, reported to a police officer that Stetler had touched her inappropriately during a hypnosis session. TL testified that Stetler suggested hypnosis to help her quit smoking and she agreed to have a session on August 11, 2011.

TL said that no one was in the office when she arrived for her session and that he locked the door. She had her session in one of the exam rooms. He began the session with a relaxation technique, but soon asked her to have an orgasm. TL stated that he touched her leg and moved his hand toward her groin area. She froze-up; she realized what was going on but "couldn't do anything about it. It's—I mean, like, my mind just shut down because I knew that what he was asking me was wrong." She explained that she did not get up and leave because she "was scared to death." He then cupped her breast and asked "if that was turning me on." Toward the end of the session, he told her she would not want to smoke anymore. TL stated that she felt betrayed, but agreed when he told her that she would need more sessions. She said she agreed because she just "needed to get out of there."

Stetler testified that he taught himself hypnosis and used it to treat his patients. Although he admitted that he had documents and media files on the use of sexual hypnosis,

he denied that he ever used sexual hypnosis on any of his patients. He explained that he used the sexual hypnosis on his wife to help with intimacy issues. Stetler said he never used hypnosis to treat TL and, although he did use hypnosis on TB, he only used hypnosis to help her quit smoking. He also denied having touched either TL or TB in a sexual manner.

Stetler's wife also testified and confirmed that he had used sexual hypnosis on her with her consent.

In closing, Stetler's trial lawyer argued that TL and TB's version of events were not credible. He suggested that TB's memories from the hypnosis session were not reliable; specifically, he noted that hypnosis involved a trance-like state that might have influenced TB's memories. To support that theory, he quoted a section concerning the "confabulation" phenomena from one of Stetler's hypnosis texts that had been admitted into evidence. He then suggested that the prosecutor failed to establish that TB's memories were accurate:

> It's the burden of the prosecutor to prove beyond a reasonable doubt that these things happened. I—I don't know whether this was a false memory or not, but we have somebody who comes in. We don't know specifically what happened to her, but we know that [TB] had a dysfunctional childhood. Does that include—I don't know; I don't know what it includes. But is it certainly quite plausible that that is a false memory? And do false memories happen under hypnosis? They do; there's no doubt about that at all.

As for TL, Stetler's trial lawyer pointed out that her version of events was inconsistent over time and inherently implausible. He then suggested that she fabricated her story for financial gain after she heard that Stetler had been arrested.

*People v. Stetler*, No. 310396, 2013 WL 1149592 at *1-3 (Mich. Ct. App. Mar. 19, 2013).[1]

---

[1] The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Petitioner does not dispute the Michigan Court of Appeals' recitation of the evidence presented at trial.

The jury found Petitioner guilty of one count of CSC III with regard to each of the victims. The trial court sentenced Petitioner on April 11, 2012, to concurrent prison terms of 30 to 180 months. Petitioner filed a direct appeal claiming that his trial counsel was ineffective for failing to call an expert witness to support the defense theory that the victims' memories were tainted by hypnosis. In an unpublished opinion issued on March 19, 2013, the Michigan Court of Appeals rejected Petitioner's claim and affirmed his conviction. Petitioner did not seek leave to appeal in the Michigan Supreme Court.

On November 11, 2014, Petitioner filed a motion for relief from judgment in the Kalkaska County Circuit Court raising the following two claims of error:

I. Trial court was without subject matter jurisdiction where the information felony documents failed to allege all elements to the crime defendant was convicted of, and is therefor[e] void, denying constitutionally guaranteed due process.

II. Reversible error occurred where testimony of what constitutes "unethical of unacceptable medical treatment" was not given, nor proven. Required directed verdict by the court was denied, denying constitutionally guaranteed due process. Issue not presented on direct appeal due to ineffective assistance of counsel.

(Pet. ¶ 11(a)(5), ECF No. 1, PageID.3.) Under Michigan law, the state court may not grant relief to the defendant if the motion alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion for relief from judgment, unless the defendant demonstrates cause and prejudice. M.C.R. 6.508(D)(3). The trial court denied Petitioner's motion on March 25, 2015. Because Petitioner asserted a jurisdictional defect in his first claim of error, the court addressed the issue on the merits. With regard to his second claim of error, the court denied relief under M.C.R. 6.508(D)(3) because Petitioner failed to show good cause for failing to raise the issue on direct appeal. The Michigan Court of Appeals and the Michigan Supreme Court denied Petitioner's

applications for leave to appeal on November 4, 2015 and September 6, 2016, respectively, because Petitioner failed to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D). Petitioner currently is on parole.

In his application for habeas corpus relief, Petitioner raises the same two claims that he presented in his motion for relief from judgment.

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the

dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v.*

*Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

## Discussion

I. Sufficiency of the Informations

In his first ground for habeas corpus relief, Petitioner contends that the trial court was without subject matter jurisdiction where the felony informations failed to allege all of the elements of the offense with which he was charged. Specifically, Petitioner argues that "the lack of words fail to state the operating facts, missing required elements to describe the crime. Nowhere is 'intent,' 'sexual purpose,' or 'unacceptable or unethical medical treatment' present as was required to convict." (Pet. ¶ 12, ECF No. 1, PageID.5.) Petitioner also appears to claim that the information failed to provide proper notice of the charges in violation of his due process rights.

In denying Petitioner's motion for relief from judgment, the trial court stated:

As to the alleged jurisdictional defect, Defendant argues that the information was not sufficient to give him notice of the charge, and that amendment of the information at this stage would not cure the lack of notice. The test for sufficiency of an indictment is as follows:

> "Does it identify the charge against the defendant so that his conviction or acquittal will bar a subsequent charge for the same offense; does it notify him of the nature and character of the crime with which he is charged so as to enable him to prepare his defense and to permit the court to pronounce judgment according to the right of the case?"

*People v. Higuera*, 244 Mich App 429, 444; 625 NW2d 444, 452-53 (2001). Amendments are permitted at any time before, during, or after the trial in order to correct defects, so long as no prejudice results to the defendant. *Id.*; *People v. Stricklin*, 162 Mich App 623, 633; 413 NW2d 457, 463 (1987).

In both informations, the charges were laid out with sufficient specificity. They list the name of the alleged victim and the crime charged. They cite the statute to some specificity, so that the accused might learn the elements of the crime. While it does not specifically allege the actions of the defendant, it alleges that he engaged in sexual contact with a named person, causing injury, and alleged that the contact was accomplished through force or coercion. Both informations give the approximate dates of the alleged offenses.

In deciding the sufficiency of an information, courts should be liberal, not technical. *People v. Adams*, 389 Mich 222, 243; 205 N.W.2d 415, 425 (1973). The allegations in the two informations were sufficient to give notice to the accused of the crimes he was being charged with and the acts he was alleged to have done. He had sufficient notice to prepare a defense. Therefore, the information was not deficient.

Even if the information *were* deficient, amendment is permitted even after the trial to correct errors in form or substance. The Defendant would not be prejudiced by such an amendment, as the charges contained in the information would have given him sufficient notice to prepare a defense, even if there was some technical deficiency. Therefore, relief from judgment is not warranted.

(Op. and Ord. Denying Relief from Judgment, ECF No. 1-1, PageID.4-5.)

The Sixth Amendment to the United States Constitution, applied to the states through Due Process Clause of the Fourteenth Amendment, guarantees a criminal defendant the right to be informed of

the nature of the accusations against him. *Cole v. Arkansas*, 333 U.S. 196, 201 (1948); *In Re Oliver*, 333 U.S. 257, 273 (1948); *Lucas v. O'Dea*, 179 F. 3d 412, 417 (6th Cir. 1999). "The due process clause of the Fourteenth Amendment mandates that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him to permit adequate preparation of his defense." *Olsen v. McFaul*, 843 F. 2d 918, 930 (6th Cir. 1988). A complaint or indictment need not follow a prescribed formula, as long as it adequately informs the petitioner of the crime in sufficient detail to enable him to prepare a defense. An indictment "which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings." *Mira v. Marshall*, 806 F. 2d 636, 639 (6th Cir. 1986); *see also Dell v. Straub*, 194 F. Supp. 2d 629, 653-54 (E.D. Mich. 2002). An alleged defect in a state court information or indictment therefore does not offend the Constitution unless a habeas petitioner can establish that: (1) he did not receive adequate notice of the charges; and (2) he was therefore denied the opportunity to defend himself against the charges. *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002).

In *Mira*, the petitioner alleged that he was denied due process of law because the indictment did not allege all of the elements of the offense of aggravated robbery. 806 F.3d at 639. He specifically claimed that the indictment was insufficient since it did not include the mental state for the offense. The Sixth Circuit found that the petitioner's claim failed to raise a cognizable constitutional claim. *Id.* The court also concluded that the indictment had sufficient information to provide the petitioner with adequate notice and the opportunity to defend and protect himself against future prosecution for the same offense. *Id.*

Petitioner similarly argues that the informations were defective because they did not include all of the elements of CSC III. Petitioner's argument is without merit. The indictments contained sufficient information to provide Petitioner with adequate notice of the charges he faced and provided him with the opportunity to defend against the charges and to protect himself against future prosecution for the same offenses. According to the trial court, each of the informations contained the name of the alleged victim, the charged offense with a statutory citation and the approximate date of the alleged offense. The informations also alleged that Petitioner engaged in sexual contact with the named person.[2] By explicitly citing the statutory provision and charging Petitioner with engaging in "sexual contact," the information provided him with adequate notice of the charge against him. The federal courts "have consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms." *United States v. Salazar*, 485 F.2d 1272, 1277 (2d Cir. 1973); *see also United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007) (internal quotation omitted) ("[N]o greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution."). As the Supreme Court has explained, it is "generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Hamling v. United States*, 418 U.S. 87, 117 (1974) (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882)). Because the statutory term "sexual contact" is defined by law to

---

[2]As previously noted, the AEDPA requires heightened respect for state factual findings. *Herbert*, 160 F.3d at 1134. Petitioner does not dispute the trial court's findings with regard to the contents of the informations in question.

require the touching to have been done for the purpose of sexual arousal or gratification,[3] the use of "sexual contact" in the information fully set forth the elements of the offenses without any uncertainty or ambiguity, and Petitioner was on notice of the mental-state element of the offenses.

In summary, the informations provided sufficient notice to protect Petitioner's due process rights. Beyond notice, a claimed deficiency in a state criminal indictment is not cognizable on federal collateral review. *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002); *Mira*, 806 F.2d at 639.

## II. Sufficiency of the Evidence

In his second ground for relief, Petitioner argues that the prosecutor failed to present sufficient evidence with regard to the element of the offense requiring force or coercion to accomplish the sexual contact. He also contends that the trial court violated his due process rights by denying his motion for a directed verdict.[4]

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the

---

[3] Under Mich. Comp. Laws § 750.520a(q), "'sexual contact' includes the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification, done for a sexual purpose . . . ."

[4] Petitioner's second ground for relief appears to be procedurally defaulted as each level of the state courts denied relief under M.C.R. 6.508(D). *See Luberda v. Trippett*, 211 F.3d 1004, 1006-07 (6th Cir. 2000); *Rogers v. Howes*, 144 F.3d 990, 994 (6th Cir. 1998). However, where the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

essential elements of the crime beyond a reasonable doubt." Where this standard is not met, the accused is entitled to a directed verdict on the charge. *Id*. This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Id*. at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The elements of CSC II as charged in this case are that: the defendant (1) caused personal injury to the victim, (2) engaged in sexual contact with the victim, and (3) used force or coercion to accomplish the sexual contact. MICH. COMP. LAWS § 750.520c(1)(f). Force or coercion includes

circumstances where the actor engages in the medical treatment or examination of the victim in a manner or for purposes that are medically recognized as unethical or unacceptable. *Id.*; MICH. COMP. LAWS § 750.520b(1)(f)(iv).

With regard to the use of unethical or unacceptable medical treatment to establish force or coercion, the Michigan Court of Appeals held that a psychotherapist's manipulation of therapy sessions to establish a relationship that would permit his sexual advances to be accepted without protest, constitutes "coercion" within the meaning of the statute. *People v. Regts*, 555 N.W.2d 896, 897 (Mich. Ct. App. 1996). The court further held the term "medical treatment" as used in the statute defining terms "force" and "coercion," should be read broadly, stating:

> The clear purpose of the statute is to protect patients from abuse by professionals who, under the guise of treatment, take advantage of the patient's vulnerabilities to achieve a sexual purpose. We do not believe that the Legislature would view the potential harm from a medical doctor different from the potential harm from a psychologist, nurse, or other health-care professional. In interpreting a criminal statute, we must give effect to the Legislature's intent. *See People v. Thomas*, 438 Mich. 448, 475 N.W.2d 288 (1991). Therefore, we conclude that "medical treatment" under the criminal sexual conduct statute should be read broadly to include forms of health care beyond just those practiced by medical doctors. Specifically, it should be read to include psychotherapy practiced by psychologists.

*Id.* at 897-98. Petitioner placed himself, with regard to the complainants, in a role analogous to that of a psychotherapist with a patient. Thus, liberally construing the statute, the type of hypnosis practiced by Petitioner on the victims would be considered "medical treatment" under the statute. In this case, TB testified that she met with Petitioner for a hypnosis session intended to help her quit smoking at 6:00 p.m., after everyone else had left the office. *Stetler*, 2013 WL 1149592 at *1. During the session, Petitioner instructed her to imagine that she was engaging in sexual intercourse with a man and was going

to have an orgasm. *Id*. He then suggested that she rub herself and expose her breasts. When she did, Petitioner pulled her shirt down further and began to pinch her nipple. *Id*. TL described a similar hypnosis session intended to help her quit smoking. Id. at *2. No one else was in the office when she arrived and Petitioner locked the door. During the session, Petitioner asked her to have an orgasm, touched her leg and moved his hand toward her groin area. He then cupped her breast and asked "if that was turning [her] on." *Id.* Viewing the evidence in the light most favorable to the prosecution, the jury could reasonably infer that Petitioner used hypnosis in a medically unethical or unacceptable manner as a means of accomplishing sexual contact with the victims. While Petitioner complains that the court did not clearly define for the jury the meaning of "unethical or unacceptable medical treatment," the conduct described by the victims during the hypnosis sessions unquestionably constituted unethical or unacceptable medical treatment under the plain meaning of those terms. Because there was sufficient evidence to support his conviction, Petitioner was not entitled to a directed verdict.

## Conclusion

In light of the foregoing, the Court will summarily dismiss Petitioner's application pursuant to Rule 4 because it fails to raise a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This Court's dismissal of Petitioner's action under Rule 4 of the Rules Governing § 2254 Cases is a determination that the habeas action, on its face, lacks sufficient merit to warrant service. It would be highly unlikely for this Court to

grant a certificate, thus indicating to the Sixth Circuit Court of Appeals that an issue merits review, when the Court has already determined that the action is so lacking in merit that service is not warranted. *See Love v. Butler*, 952 F.2d 10 (1st Cir. 1991) (it is "somewhat anomalous" for the court to summarily dismiss under Rule 4 and grant a certificate); *Hendricks v. Vasquez*, 908 F.2d 490 (9th Cir. 1990) (requiring reversal where court summarily dismissed under Rule 4 but granted certificate); *Dory v. Comm'r of Corr. of New York*, 865 F.2d 44, 46 (2d Cir. 1989) (it was "intrinsically contradictory" to grant a certificate when habeas action does not warrant service under Rule 4); *Williams v. Kullman*, 722 F.2d 1048, 1050 n.1 (2d Cir. 1983) (issuing certificate would be inconsistent with a summary dismissal).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated: April 13, 2017 　　　　　　　　　　/s/ Paul L. Maloney
　　　　　　　　　　　　　　　　　　　　Paul L. Maloney
　　　　　　　　　　　　　　　　　　　　United States District Judge